UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CK FRANCHISING, INC.,⟩
⟩
    Plaintiff,⟩
⟩      No. 6:18-CV-94-REW-HAI
v.⟩
⟩
SAS SERVICES INC.,[1]⟩      OPINION AND ORDER
⟩
    Defendant.⟩

*** *** *** ***

The parties filed rival summary judgment motions. Plaintiff CK Franchising, Inc. (CKFI) seeks a declaration that the forum-selection component of the alternative dispute resolution (ADR) provision in its franchise agreement with Defendant SAS Services Inc. (SAS) is valid and enforceable. SAS disagrees. Because the Court finds the ADR forum choice valid and binding on SAS, it grants CKFI's motion and denies Defendant's competing effort.

## A. Factual and Procedural Background

The material facts of this case are straightforward and not in dispute. CKFI (the "CK" standing for "Comfort Keepers") is a national franchisor of in-home, nonmedical care services. DE #11 ¶¶ 2, 6. Sarah Short and her mother, Mary Perkins, jointly own SAS, which operates a CKFI franchise in the Somerset, Kentucky area. DE #55-1 (Short Dep.) at 11–15. [2] Short, who

---

[1] The franchise contract central to this dispute omits the comma between "SAS Services" and "Inc.", *see* DE #51-7 at 5–6, as does the Complaint, Amended Complaint, and, thus, the docket sheet, *see* DE ##1 & 11. SAS's own pleadings and briefing, however, include a comma. *See, e.g.*, DE ##9 & 52. The Court defers to the at-issue contract in reproducing the parties' names here.

[2] The deposition transcripts filed in the record are formatted as four original transcript pages per CM/ECF page. The deposition citations in this Order refer to the original transcript pagination, as opposed to the CM/ECF pagination.

formerly worked for a Lexington CKFI franchisee, purchased the Somerset territory in 2007 with Perkins and, accordingly, entered a franchise agreement with CKFI.[3] *Id.* at 15–16. Before entering the franchise agreement, Short and Perkins reviewed the contract and accompanying Offering Circular (*see* DE #51-4) and consulted with an attorney about the documents and prospective enterprise.[4] DE #55-1 at 25–26. Short and Perkins are both educated and have experience in the in-home care industry. Short has a master's degree in social work and a specialized certificate in gerontology, and she worked with other CKFI franchisees in less formal capacities before purchasing the Somerset territory. *See* DE #55-1 at 8–20. Similarly, Perkins is college-educated and familiar with the industry. *See id.*

The 2007 CKFI-SAS franchise contract mandated certain ADR procedures. *See* DE #51-3 at 24 (§§ 12.7–12.8). Relevant here, it provided that mediation and arbitration would occur "in Dayton, Ohio or, if Comfort Keepers has moved its principal place of business, in the city where Comfort Keepers' principal place of business is located." *Id.* at 3 (§§ 12.7.3 & 12.8).[5] After reviewing the 2007 contract with Short's attorney (Randall Short), she had a few matters she wished to discuss further with CKFI, but did not recall which issues those were, specifically, or whether the ADR portion of the agreement was one of them. DE #55-1 at 25 ("[W]e had some things within it that [Randall Short] brought to my attention, wanting me to be aware of, negotiate on, what have you[.]"); *id.* at 26–28 (Sarah Short testifying that she did not recall which matters those were or whether she and Randall Short ever discussed the ADR provision). Per SAS, CKFI was unwilling to alter the 2007 agreement. *Id.* at 25 ("[E]ssentially the franchise agreement was

---

[3] The pair personally signed the purchase and franchise agreements but formed SAS immediately thereafter, and SAS became formal owner of the franchise.

[4] The involved attorney at the time was Randall Short, Sarah Short's father-in-law. *See* DE #55-1 at 18, 25–28.

[5] At the time of 2007 contracting, CKFI was principally based in Dayton, Ohio.

as it was written. There was no, 'Well, sure, we'll change that for you, Sarah.' It is what it is, you sign it as it is."). Nevertheless, SAS entered the franchise agreement with CKFI, and, over the next ten years as a CKFI franchisee, grew to employ thirty people and serve approximately seventy-five clients in the Somerset area. *Id.* at 8–10.

The 2007 franchise agreement, with a ten-year term, became subject to optional renewal in 2017. In March 2016, CKFI contacted SAS to alert it to the upcoming contract expiration and inquire whether SAS wished to renew. *See* DE #55-5. There is no indication in the record that SAS then responded to the March 2016 inquiry. In October 2016, CKFI again reached out to SAS regarding franchise renewal. *See* DE #55-6. Similarly, the record divulges no SAS response to the October 2016 letter. In late January 2017, Short emailed her regional director (at the time, Emily Jones), noting that her "10 year franchise agreement [wa]s up at the end of April" and asking how to "go about reviewing and signing a new one[.]" DE #55-1 at 48–49. Around this time, Short also became concerned that the Lexington, Kentucky CKFI franchisee was serving clients in her protected Somerset territory. *Id.* at 51–52; *see id.* at 11. Short contacted Jones about the alleged rogue franchisee but states that she received no response. *Id.* at 51–52 ("I asked . . . Emily to let me know what my provisions of my territory are because we're in dispute and I have a franchise agreement to sign and I want to make sure that I actually have a protected territory, I don't believe I got a response[.]").

In April 2017, Short and Perkins received a letter regarding franchise renewal (dated April 10), which enclosed the new franchise agreement. DE #55-7. The letter directed SAS (if renewing) to return the executed new agreement to CKFI by April 28, 2017. *Id.* The 2017 franchise renewal agreement (here referred to as "the Agreement") contained forum-selection clauses within the "Mediation" and "Arbitration" sections (grouped together in the ADR portion of the Agreement)

that closely resembled the 2007 language. The Agreement provided that "mediation must take place in the city where CKFI's principal place of business is then located[,]" and further stated that "arbitration must be brought in the city where CKFI's principal place of business is then located." DE #51-7 at 3–4 (§§ 12.7.3 & 12.7.4). SAS did not discuss the 2017 Agreement with an attorney, nor did it seek to negotiate any provision in the Agreement with CKFI. *See* DE #55-1 at 51 ("I could have, but I knew how this worked. You take it, read it, sign it, turn it back. There's no changing of things, so what does it matter in the end?"); *id.* at 59 (Short responding that she did not seek to negotiate the ADR provision in the 2017 Agreement due to "the experience of '07 where you don't negotiate it"). Regardless, SAS signed the 2017 renewal Agreement and returned the executed copy to CKFI. *Id.* at 52 ("I signed the document anyway because you got a business . . . You can't just shut down your business."); *see also* DE #51-7 at 5 (2017 Agreement signatures). Short, did, however, personally read and review the 2017 Agreement. *See* DE #55-1 at 50, 56–59.[6]

In December 2017, after SAS entered the Agreement, CKFI announced that it would be relocating its corporate headquarters from Dayton, Ohio to Irvine, California. DE #51-10 at 1. Thereafter, SAS initiated the ADR process to address the issue of the encroaching CKFI franchisee, and CKFI sought to enforce the forum-selection component within the Agreement's ADR provision. DE #55-1 at 74 ("I started the ADR in good faith. We were told . . . that CKFI was not budging on this . . . it had to be in California, it could not be in Dayton[.]"); *id.* at 77 ("[W]e were told exclusively it had to be done in California[.]").

---

[6] Although Short qualifies that she "kind of skimm[ed] through this thing" (referring to the 2017 Agreement), *see* DE #55-1 at 58, and "did not read every line of everything in the document[,]" *id.* at 59, she admits that she "essentially reviewed it[,]" *id.* at 50 and "understood the terms that were in the" Agreement, *id.* at 56.

Ultimately, the parties failed to reach a consensus on the ADR location issue; this action followed. CKFI requests a declaratory judgment that the ADR forum-selection elements are valid and enforceable as written. DE #11 (Amended Complaint). After limited discovery to place the (undisputed) relevant facts in the record, the parties each sought summary judgment on their respective legal theories. DE ##51 & 52. Both motions are fully briefed and ripe for decision. *See* DE ## 56, 57, 58, 59.

### B. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c)

mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

The summary judgment standard remains the same where the parties pursue cross-motions; the Court "must evaluate each party's motion on its own merits" and, in doing so, "draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citation omitted); *accord Lansing Dairy Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Likewise, the selfsame summary judgment standard

applies equally in the declaratory judgment context. *See, e.g.*, *Olympic Arms v. Magaw*, 91 F. Supp. 2d 1061, 1066 (E.D. Mich. 2000), *aff'd sub nom. Olympic Arms, et al. v. Buckles*, 301 F.3d 384 (6th Cir. 2002) (applying ordinary summary judgment standard in declaratory judgment action); *Cont'l Cas. Co. v. Auto Plus Ins. Agency, LLC*, 676 F. Supp. 2d 657, 661 (N.D. Ohio 2009) (same); *Cameron v. Hess Corp.*, 974 F. Supp. 2d 1042, 1049 (S.D. Ohio 2013) (same). Here, given the lack of any factual dispute surrounding the contractual ADR forum issue, the parties (and the Court) agree that summary judgment is appropriate. *See Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 179 (6th Cir. 1996) ("In contract actions, summary judgment may be appropriate when the documents and/or evidence underlying the contract are undisputed and there is no question as to intent.").

### C. FAA Applicability and Subject Matter Jurisdiction

The parties dispute whether the Federal Arbitration Act (FAA), 9 U.S.C. § 1, *et seq.*, or the Kentucky Uniform Arbitration Act (KUAA), governs the Agreement's ADR provisions. SAS argues in its summary judgment motion that, under the KUAA (which SAS—without substantive analysis—deems the authority applicable to § 12.7 of the Agreement), Kentucky courts lack subject matter jurisdiction to enforce an agreement to arbitrate outside of Kentucky. *See* DE #52 at 14–15. In its response to CKFI's summary judgment motion, however, SAS concludes that the FAA/KUAA applicability question "is a secondary issue which the court does not need to address to reach a decision[,]" DE #56 at 1, presumably because SAS primarily argues that the at-issue forum-selection clause in § 12.7 of the Agreement is unconscionable (and thus unenforceable), regardless.[7] Given the Court's conclusion *infra* that the ADR forum-selection component of § 12.7

---

[7] Neither party challenges the validity of the Agreement generally (indeed, doing so would undermine the basis for SAS's breach of contract dispute—the substantive disagreement giving rise to the arbitration need). Nor do the parties dispute whether arbitration is proper or disagree as

is not unconscionable, it is appropriate at the outset to settle the threshold issue of which law properly frames the analysis and to resolve the raised jurisdictional concerns.

"The FAA applies to '[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction[.]" *Stutler v. T.K. Constructors Inc.*, 448 F.3d 343, 345 (6th Cir. 2006) (quoting 9 U.S.C. § 2). "[T]he term 'involving commerce' in the FAA [i]s the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 123 S. Ct. 2037, 2040 (2003). The Supreme Court thus found it "perfectly clear that the FAA encompasses a wider range of transactions than those actually . . . 'within the flow of interstate commerce.'" *Id.* (quoting *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 115 S. Ct. 834, 839 (1995)). Here, it is entirely unnecessary to consider the bounds of that range, as the CKFI-SAS franchise transaction is decidedly already within the narrower "flow of interstate commerce." The Agreement memorializes an ongoing business relationship between corporations from different states—one a national franchisor—and plainly contemplates an interstate business. *See, e.g.*, § 12.2 (DE #11-1 at 5) (anticipating a franchisee "located outside of the State of Ohio[,]" where CKFI's principal place of business was located at the time the Agreement was executed). Indeed, SAS is incorporated and has its principal place of business in Kentucky, while CKFI is incorporated in Ohio and has its (current) principal place of business in California. *See* DE #11

---

to the scope of arbitrable issues. SAS objects *only* to the clause within the Agreement's ADR subset purportedly requiring the ADR to occur wherever CKFI is then principally based. Thus, CKFI simply seeks a declaration that § 12.7 of the Agreement binds SAS precisely as written, including the contractually agreed ADR process forum. The parties do not question, however, whether this Court is the proper forum for seeking that determination—they do not mention (and the Agreement is entirely silent as to) any general (non-ADR) forum or venue selection.

(Amended Complaint) at ¶¶ 2–3. There can be no doubt that the parties' Agreement is one "evidencing a transaction involving [interstate] commerce[.]" *Stutler*, 448 F.3d at 345.

Congress (pursuant to its commerce clause powers) enacted the FAA for the "purpose of overcoming judicial hostility to arbitration[,]" *Circuit City Stores, Inc. v. Adams*, 121 S. Ct. 1302, 1305 (2001), and ensuring ADR provision enforcement per agreement. *See Perry v. Thomas*, 107 S. Ct. 2520, 2525 (1987) ("Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." (citation omitted)). Thus, absent an ADR provision's clear intent otherwise, "the FAA generally preempts inconsistent state laws and governs all aspects of arbitrations concerning 'transaction[s] involving commerce[.]'" *Savers Prop. & Cas. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, 748 F.3d 708, 715 (6th Cir. 2014). However, "parties may agree to abide by state rules of arbitration, and 'enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA.'" *Id.* at 715–16 (quoting *Muskegon Cent. Dispatch 911 v. Tiburon, Inc.*, 462 F. App'x 517, 522–23 (6th Cir. 2012) (citations omitted)). "The central inquiry in this choice-of-law determination is whether the parties unambiguously intended to displace the FAA with state rules of arbitration[.]" *Id.* at 716.

In the 2007 CKFI-SAS franchise agreement, the "Governing Law" provision expressly provided that Ohio law governed all parts of the contract *except* the ADR portion. *See* DE #51-3 at 2 (§ 12.2 providing that "the arbitration provisions of this Agreement are expressly and exclusively governed by and should be construed in accordance with the Federal Arbitration Act"). The ADR provision, itself, was silent as to governing law. *See id.* at 2–4. In the 2017 iteration, however, the "Governing Law" provision made no exception for the ADR clause. *See* DE #11-1 at 5 (§ 12.2 simply providing that "[t]his Agreement is made in the State of Ohio and its provisions shall be governed by and enforced and interpreted exclusively under the laws of that state"). The

ADR portion again makes no mention of any applicable (state or federal) law. *See id.* at 5–7 (§ 12.7 of the Agreement). The 2017 Agreement, thus, is considerably less clear regarding the FAA's applicability to the contract's ADR section than the 2007 version.[8]

Nevertheless, the 2017 Agreement's general "Governing Law" section—applying Ohio law to the Agreement as a whole—is insufficient to establish that the parties unambiguously intended to displace the FAA as applied to the ADR provisions. *See, e.g.*, *Martis v. Dish Network Serv., L.L.C.*, 597 F. App'x 301, 304 (6th Cir. 2015) (applying the FAA where an arbitration agreement "state[d] that it [wa]s governed by both the FAA and Michigan's substantive law" and noting that "[a]mbiguities are resolved in favor of the federal standard"); *see id.* (citing *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 303 (6th Cir. 2008) and referencing *Uhl*'s conclusion that, "where the parties' choice of law provision referenced both the FAA and Michigan law, the FAA governed"); *cf. Savers*, 748 F.3d at 716 (finding the FAA unambiguously displaced by Michigan law where, under both the "general choice-of-law provision and the arbitration clause, both parties agreed that any arbitration shall be 'subject to the laws of the State of Michigan'"); *Muskegon Cent. Dispatch 911 v. Tiburon, Inc.*, 462 F. App'x 517, 523 (6th Cir. 2012) (discerning unambiguous intent to apply Michigan law where the arbitration agreement did not reference the FAA but, rather, contemplated "final and binding arbitration . . . pursuant to the provisions of MCL 600.5001–600.5035 [the Michigan Arbitration Act]").

The Agreement's failure to specifically note Ohio law applicability to arbitration in its general choice-of-law provision is telling and sharply contrasts with the Circuit cases finding clear

---

[8] In opposing FAA application to § 12.7 of the 2017 Agreement, SAS does not actually advocate for application of Ohio ADR law in the alternative. Rather, in arguing that this Court lacks subject matter jurisdiction to enforce the Agreement's ADR provisions, SAS simply presumes that the KUAA governs (without substantively justifying why that would be the case).

intent to displace the FAA. Unlike in *Savers* and *Tiburon*, the Agreement does not apply Ohio law in the ADR context, but, rather, simply to the contract generally. And, the ADR provision itself is silent on the issue. The choice of law governing the parties' ADR agreement is thus, at best, ambiguous. Accordingly—given the default to FAA application in the face of contractual choice-of-law ambiguity—the FAA governs the ADR agreement in the CKFI-SAS 2017 franchise contract. *See Tiburon*, 462 F. App'x at 523 (quoting *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 128 S. Ct. 1396, 1405 n.6 (2008)) ("In making a choice of law determination, the central inquiry is whether the parties' agreement evinces an unambiguous intent to 'predicate[ ] the court's judicial action on the parties' having agreed to specific standards' . . . Ambiguities are resolved in favor of the federal standard." (citing *E.E.O.C. v. Waffle House, Inc.*,122 S. Ct. 754, 764 n.9 (2002)). On this record, and in particular given the lack of advocacy by SAS on the key analysis, the Court finds the FAA applicable.[9]

The FAA does not provide an independent jurisdictional basis, but it allows federal district courts to hear challenges to the enforceability or validity of an ADR provision:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

---

[9] SAS did not explicate the contract or make a particular argument on FAA application. The default is FAA coverage in this interstate commercial context, and the Court must assess, relative to the arbitration agreement, whether the parties "unambiguously intended to displace the FAA with state rules of arbitration." *Savers*, 748 F.3d at 716. The textual evolution makes the matter worthy of debate, but a doubtful result calls for application of the default rule. The parties did not disclaim the FAA and did not invoke any other law particular to the mechanics and standards of arbitration. Under the cases, the Court thus applies the FAA. *See also Ferro Corp. v. Garrison Indus., Inc.*, 142 F.3d 926, 937 (6th Cir. 1998) (quoting *National Union Fire Ins. Co. v. Belco Petroleum*, 88 F.3d 129, 134–35 (2nd Cir. 1996)) (addressing effect of general state choice-of-law clause on FAA application and determining that "the choice-of-law clause is not an 'unequivocal inclusion' of the [limiting] Ohio rule").

9 U.S.C. § 4; *see also Pine Tree Villa, LLC v. Coulter*, No. 3:15-CV-00815-CRS, 2016 WL 3030185, at *2 (W.D. Ky. May 25, 2016). CKFI and SAS are completely diverse, and the amount in controversy exceeds the federal jurisdictional minimum; accordingly, the Court has subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1332. Consequently, CKFI is entitled to petition this Court "for an order directing that [] arbitration proceed in the manner provided for" under the Agreement's terms (which include, of course, the agreed-upon arbitration location). 9 U.S.C. § 4. Contrary to SAS's argument, the Kentucky Supreme Court's opinion in *Ally Cat, LLC v. Chauvin*, 274 S.W. 3d 451 (Ky. 2009)—holding that Kentucky courts have jurisdiction to enforce arbitration agreements under the KUAA only where they provide for arbitration in Kentucky—has no bearing here. The KUAA, not the FAA, governed the arbitration agreement in *Ally Cat*.[10] The FAA applies here—permitting CKFI to seek a declaration that the forum choice in § 12.7 of the Agreement binds SAS as written—and this Court undoubtedly has subject matter jurisdiction to enforce it. *See Pine Tree Villa*, 2016 WL 3030185, at *1–*2.

**D. Unconscionability Defense**

Even FAA-governed ADR agreements remain subject to generally applicable state law contract defenses. "An agreement to arbitrate is valid, irrevocable, and enforceable, as a matter of federal law, 'save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Stutler*, 448 F.3d at 345 (citing *Perry v. Thomas*, 107 S. Ct. 2520, 2527 n.9 (1987). The state law defense must pertain to contracts generally and not be intentionally hostile to arbitration,

---

[10] The Court has much doubt that a federal court simply sitting in Kentucky is included among the "Kentucky courts" subject to the KUAA's jurisdictional restriction; although it is unnecessary to conclusively interpret that here, the phrase, in context, and given principles of federalism, likely means Kentucky *state* courts.

as would be inconsistent with the purpose of the FAA. *See id.* (noting that the "state law . . . is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally."). SAS invokes only the defense of unconscionability, arguing that the at-issue forum-selection component of the ADR provision is both procedurally and substantively unconscionable.

## 1. Choice of Law

The parties mildly debate whether Kentucky or Ohio law supplies the proper unconscionability standard.[11] As previously discussed, the "Governing Law" section of the (2017) Agreement expressly provides generally for application of Ohio law. *See* DE #11-1 at 5, § 12.2. Typically, a federal court sitting in diversity applies the substantive law of the state in which it sits. *See, e.g.*, *Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 361 (6th Cir. 1993). In preliminarily assessing enforceability of the CKFI-SAS choice-of-law provision, the Court applies Kentucky law. *See Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000) ("[A]s the lower court correctly observed, the choice-of-law rules of the forum state, Kentucky, govern the determination whether to enforce the Guaranty's selection of Tennessee law."). The Court therefore considers: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil,

---

[11] The parties recognize that Kentucky and Ohio law are similar on the issue of unconscionability. *See* DE #51-1 at 13–14; *accord* DE #56 at 1. CKFI and SAS argue that their respective positions would be meritorious regardless of which substantive state law the Court applies. Nevertheless, the standards and interpretive case law are not identical between the two states, and the Court must still perform the choice-of-law analysis and apply the correct standard.

residence, nationality, place of incorporation and place of business of the parties."[12] Restatement

(Second) of Conflict of Laws, § 188(2); *see Hackney*, 657 F. App'x at 571. [13]

Balancing these factors, Kentucky has the most substantial connection to the transaction

and parties. SAS—one of the two parties to the Agreement—is incorporated and has its principal

place of business in the Commonwealth. *See* DE #11 at ¶ 2; *see also* DE #55-1 at 7. SAS President

(and 91% owner) Sarah Short and Secretary (9% owner) Mary Perkins—the individuals that signed

the Agreement, *see* DE #51-7 at 5—reside in Somerset, Kentucky (and the record, on the whole,

suggests that they intend to remain in Kentucky). *See* DE #55-1 at 7–8, 15–16. Critically, SAS

operates its Comfort Keepers franchise (which the Agreement governs) exclusively in the

Somerset, Kentucky territory. *Id.* at 12–13. In addition to Short and Perkins, SAS employs

---

[12] The *Wallace Hardware* Court (interpreting *Breeding v. Massachusetts Indem. and Life Ins. Co.*, 633 S.W.2d 717 (Ky. 1982)) "made an *Erie* guess that Kentucky courts would enforce contractual choice of law provisions unless 'the chosen state has no substantial relationship to the parties or the transaction[,]'" tracking the analysis outlined in Restatement (Second) of Conflicts § 187. *Osborn v. Griffin*, 865 F.3d 417, 443–44 (6th Cir. 2017) (quoting *Wallace Hardware*, 223 F.3d at 397). However, a later Kentucky decision confirmed the Commonwealth's strong commitment to applying its own law, "even in spite of an otherwise-valid choice-of-law clause[,]" and the Circuit reversed course. *Id.* (citing *Schnuerle v. Insight Commc'ns Co.*, 376 S.W.3d 561, 566–67 (Ky. 2012)); *see Hackney v. Lincoln Nat'l Fire Ins. Co.*, 657 F. App'x 563, 570 (6th Cir. 2016). It decided (per *Schnuerle*) that Kentucky courts would in fact apply the most-significant-relationship test found in § 188 of the Restatement. *Hackney*, 657 F. App'x at 571. Moreover, Kentucky applies § 188 *to the exclusion of* § 187, it seems, despite an otherwise-valid choice-of-law provision. *See id.* at 570 ("The Kentucky Supreme Court [in *Schnuerle*] did not mention § 187; rather, it applied the factors delineated in § 188(2) and weighed the relative interests of Kentucky and New York in the litigation . . . *Wallace Hardware*'s assumption about the Kentucky Supreme Court's application of § 187 has now proven faulty."); *see also Osborn*, 865 F.3d at 444 ("Kentucky's most-substantial-relationship test trumps even an otherwise-valid choice of law clause when the dispute is centered in Kentucky."). Accordingly, the Court here follows the § 188(2) analysis, without regard to whether § 187 might produce a different result. *Cf. See Leafguard of Kentuckiana, Inc. v. Leafguard of Kentucky, LLC*, 138 F. Supp. 3d 846, 854–55 (applying—post-*Schnuerle*, but pre-*Hackney* and *Osborn*—both the § 187 and § 188 standards to a choice-of-law analysis).

[13] Because CKFI and SAS argue that their positions prevail regardless of which law applies (and each briefs the unconscionability issue dually under Kentucky and Ohio law), they do not apply or argue these factors. The Court thus independently considers them based on the record.

caregivers, who work in-home with clients in the Somerset area, as well as a client care coordinator, a scheduling coordinator, and a marketing recruiter, who all work out of SAS's principal office in Somerset. *Id.* at 8–9. Further, SAS reviewed and signed the franchise contracts (both in 2007 and in 2017) from Kentucky. *See id.* at 51–52, 59–60 (Short describing the process of SAS receiving the contract by mail, reading it, signing it, and then sending it back to CKFI); *see also* DE #55-7 (cover letter accompanying the 2017 CKFI franchise renewal agreement mailed to SAS in Somerset, Kentucky, which notes enclosure of a return mailing label to send the executed Agreement to CKFI). The underlying territorial dispute is about a Kentucky competitor.

The CKFI-SAS relationship is less closely tethered to Ohio. CKFI is incorporated in Ohio but currently principally based in California. *See* DE #5. Although CKFI's headquarters did not officially switch to Irvine until after SAS signed the renewal Agreement, *see* DE #55-1 at 59,[14] the franchise renewal contract was sent to SAS for execution from CKFI's office in Costa Mesa, California,[15] where the prepaid return envelope was thus rerouted; presumably, then, CKFI executed the Agreement from California, not Ohio. *See* DE #55-7 at 2. The strongest tie to Ohio is Short's training and regional meeting attendance in Dayton. *See* DE #55-1 at 72–73. And, this connection is tempered by the bulk of Agreement performance (*i.e.*, SAS's operation of the Somerset franchise) being in Kentucky. Kentucky has a sharp interest in regulating a contract governing a Kentucky-based franchise exclusively operating in the Commonwealth (both employing and servicing Kentuckians)—and, as relevant here, ensuring that the agreement is not unconscionable. *See Hackney*, 657 F. App'x at 571 ("[G]iven that Hackney was to perform his

---

[14] *Compare* DE #55-8 at 2 (December 2017 email informing franchisees of CKFI principal location change) *with* DE #55-7 at 1 (2017 franchise renewal contract offer providing renewal deadline of April 28, 2017).

[15] Per Cisneros, the Costa Mesa office is no longer in operation. *See* DE #55-2 at 9 (testifying that the only CKFI location in California is the Irvine headquarters).

obligations while living and working predominantly in Kentucky, it is likely that Kentucky's interest in its citizens' employment contracts—especially those which are to be performed within the commonwealth—is sufficient for its law to apply.").[16] Accordingly—particularly given Kentucky's fierce predilection for applying its own law, *see Osborn*, 865 F.3d at 443 (collecting cases)—Kentucky courts would apply Kentucky law in this scenario. This Court thus follows.

## 2. Application of Kentucky Unconscionability Law

The doctrine of unconscionability is "directed against one-sided, oppressive and unfairly surprising contracts, and not against the consequences per se of uneven bargaining power[.]" *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341 (Ky. Ct. App. 2001) (quoting *Louisville Bear Safety Service, Inc., v. South Central Bell Telephone Company*, 571 S.W.2d 438, 440 (Ky. Ct. App. 1978) (citation omitted)). "An unconscionable contract has been characterized as 'one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other.'" *Id.* at 342 (citing *Louisville Bear*, 571 S.W.2d at 440 (quoting *Black's Law Dictionary*, 1694 (4th ed.1976))). "Whether a contract provision is unconscionable is 'highly fact specific.'" *Grimes v. GHSW Enterprises, LLC*, 556 S.W.3d 576, 583 (Ky. 2018) (quoting *Kegel v. Tillotson*, 297 S.W.3d 908, 913 (Ky. App. 2009)). In Kentucky, an agreement need not necessarily be both substantively and procedurally unconscionable; a finding of either may suffice to invalidate the contract or provision.[17] *See Schnuerle*, 376 S.W.3d at 576 n.12.

---

[16] *Cf. MegaCorp Logistics, LLC v. Turvo, Inc.*, No. CV 17-109-DLB-CJS, 2018 WL 1020118, at *4 (E.D. Ky. Feb. 22, 2018) (finding that Kentucky did not have the more substantial connection where no party was incorporated or headquartered in Kentucky, no party had members residing in Kentucky, and the services under the agreement were expressly to be performed in California).

[17] This is a notable divergence from Ohio law. *Cf. Hayes v. Oakridge Home*, 908 N.E.2d 408, 412 (Ohio 2009) ("The party asserting unconscionability of a contract bears the burden of proving that the agreement is both procedurally and substantively unconscionable."). However, as SAS has not

### a. Procedural Unconscionability

Procedural unconscionability "pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language[.]" *Conseco*, 47 S.W.3d at 343 n.22. It is often marked by "material, risk-shifting contractual terms which are not typically expected by the party who is being asked to 'assent' to them and often appear [ ] in the boilerplate of a printed form." *Id.* (internal quotation marks and citation omitted). Relevant factors in the inquiry "include the bargaining power of the parties, 'the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice.'" *Schnuerle*, 376 S.W.3d at 576 (quoting *Jenkins v. First American Cash Advance of Georgia, LLC*, 400 F.3d 868, 875–876 (11th Cir. 2005)). Adhesion contracts—ones that the weaker party must accept (if at all) on a take-it-or-leave-it basis—although not improper or necessarily disfavored, are especially susceptible to such abuse. *See id*. In adhesion agreements, "[o]ppressive terms ancillary to the main bargain can be concealed in fine print and couched in vague or obscure contractual language[,]" non-obvious to the lay reviewer and not subject to potential negotiation or modification. *Id.*

It is unnecessary to decide whether the CKFI-SAS contract is truly one of adhesion.[18] Even assuming, for instant purposes, that the Agreement has adhesive characteristics, the forum-

---

shown *either* procedural *or* substantive unconscionability (per the proceeding discussion), the distinction is immaterial as a practical matter.

[18] SAS contends that it is. SAS claims it had no opportunity to negotiate the Agreement's terms. However, it is impossible to gauge that position, as SAS did not actually seek to challenge, modify, or negotiate any portion of the 2017 Agreement. DE #55-1 at 60. Short declined to do so based on her 2007 experience, which led her to assume that CKFI would be unwilling to alter the 2017 renewal contact; she does not state what she had hoped to negotiate in 2007 or indicate precisely how CKFI responded. *Id.* at 25 ("[W]e had some things within it that [Randall Short] brought to my attention, wanting me to be aware of, negotiate, what have you, I brought that forward to whomever it was. And essentially the franchise agreement was as it was written, there was no, 'Well, sure, we'll change that for you, Sarah,' It is what it is, you sign it as it is."). As further

selection component of the ADR provision is not procedurally unconscionable. First, SAS is a sophisticated entity, rather than an unwitting consumer, and Short and Perkins are both educated businesswomen. Short has a master's degree in social work and a specialized certificate in gerontology, had ten years' experience operating SAS when the franchise agreement came up for renewal, and had previously worked with other CKFI franchisees in less formal capacities before purchasing the Somerset location. *See* DE #55-1 at 8–20. Further, SAS had the unlimited opportunity to consult with legal counsel prior to signing the Agreement; indeed, it had done so in 2007. SAS admits that it similarly could have asked an attorney to review the 2017 Agreement and could have asked CKFI questions related to the Agreement's terms, but that it declined to do so.[19] *Id.* at 50–51. The renewal followed a ten-year original term. SAS knew well the contractual posture and relationship.

---

support for the belief that CKFI would not negotiate, SAS points to certain (bolded) language in the April 2017 cover letter accompanying the proposed Agreement: "The New Agreement and all attachments must be signed where indicated without any insertions, deletions, or other changes." DE #57-7 at 1. However, this likely was intended to disabuse franchisees of any expectation that unilateral changes they inserted would incorporate into the final agreement, rather than to bar franchisees from attempting to negotiate or modify potential terms. *See, e.g.*, DE #55-2 at 24–25 (Cisneros testifying that "[t]he reason for that statement is so franchisees understand that they cannot mark up the agreement, sign it and return to us, and assume that they are binding."). Similarly, although SAS notes that renewal correspondence from CKFI stated that SAS would be required to "sign CKFI's then current form of the franchise agreement[,]" *see* DE #55-5, in context, this simply appears to alert franchisees that they would be signing updated versions of their prior agreements. CKFI, for its part, asserts that SAS could have sought to negotiate the Agreement's terms; yet, CKFI does not cite instances where such franchisee-initiated negotiation proved successful. *See id.* at 45–46 ("Our franchisees always have the opportunity to request any kind of negotiate[ion] with the franchise agreement . . . and we review with our legal counsel to see if [ ] we can make any adjustments or negotiate any part of it . . . It is my limited with knowledge with negotiations of the franchise agreement. I do know of requests that have been made. I do not know what the results were to those requests.").

[19] Short did testify that she emailed her regional director to inquire as to SAS's territorial limits, but she signed the Agreement without getting a response or contacting anyone else at CKFI about the issue. *Id.* at 51–52.

SAS also argues that it lacked time to meaningfully review or consider the Agreement, emphasizing that the proposed (then-final) Agreement was sent to SAS on April 10, 2017, and due back to CKFI executed by April 28, 2017. *See* DE #55-7 at 1. However, SAS was aware that it was approaching franchise agreement expiration at least as early as March 2016, when CKFI reached out to SAS about potential renewal. *See* DE #55-5 at 1. In fact, CKFI notified SAS that CKFI would be willing to begin the renewal process at that time, if SAS so desired. *Id.* SAS then had nearly ten years' experience operating under the 2007 franchise contract and was familiar with its terms; if SAS wished to negotiate the terms of the franchise renewal agreement, it could have contacted CKFI to begin the process in March 2016, rather than waiting for the 2007 agreement's near-expiration roughly a year later. Moreover, the 2007 contract contains the same ADR forum requirement as the 2017 version: "Mediation . . . will be conducted . . . in Dayton, Ohio or, if Comfort Keepers has moved its principal place of business, in the city where Comfort Keepers' principal place of business is located." DE #51-3 at 3. The 2007 contract further provides that "[i]f Comfort Keepers has moved its principal place of business at the time arbitration is sought, then the arbitration must be conducted in the city where Comfort Keepers' principal place of business is located." *Id.*

Given its knowledge of the potential territory dispute before signing the 2017 Agreement, SAS surely was on notice that the ADR provision in the Agreement could become important. SAS thus had ample time to discuss the ADR forum requirement with counsel and, as necessary, seek to negotiate it with CKFI before renewal. The record contains no indication that SAS sought to begin renewal discussions in or near March 2016, when prompted, that SAS requested a draft of the then-current renewal agreement for earlier review, or that SAS raised any concerns about potential renewal terms. Rather, Short contacted her regional director in January 2017 to inquire

as to the renewal process. *See* DE #55-1 at 48–49. Accordingly, SAS's assertion that the ultimate 18-day final execution turnaround abridged its ability to meaningfully assess the Agreement and/or discuss any concerns about the terms with CKFI is unpersuasive.

Nor is the Agreement's ADR provision hidden or intentionally buried within the broader document. Truthfully, the Agreement is lengthy (62 pages). *See* DE #51-7 at 5. Yet, it is organized clearly and logically, with the "Dispute Resolution" section title conspicuously bolded and underlined, and the "Mediation" and "Arbitration" subsection titles underlined, as well. *Id.* at 2– 4. The forum-selection component of the ADR provision is included twice, in both the "Mediation" and the "Arbitration" subsections; first, the Agreement states: "The mediation must take place in the city where CKFI's principal place of business is then located." *Id.* at 3. It then states in the "Arbitration" subsection: "The arbitration must be brought in the city where CKFI's principal place of business is then located." *Id.* at 4. These statements are clear, direct, and use ordinary language (without legalese) to convey the Agreement's unequivocal ADR forum requirement (which, again, mirrors the forum requirement in the 2007 agreement).

SAS nevertheless argues that this clear ADR forum dictate contradicts language within the Franchise Disclosure Document (FDD) accompanying the franchise renewal contract. However, a complete review of the FDD refutes that contention. First, the FDD begins by emphasizing the importance of reviewing the actual franchise contract carefully (and, ideally, with counsel). It advises: "The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract. Read all of your contract carefully. Show your contract and this disclosure document to an advisor, like a lawyer or an accountant." DE #51- 6 at 1. Turning next to the portion SAS highlights, the second page of the document provides:

Please consider the following RISK FACTORS before you buy this franchise:

1. THE FRANCHISE AGREEMENT REQUIRES YOU TO RESOLVE DISPUTES WITH US BY MEDIATION/ARBITRATION/LITIGATION ONLY IN OHIO, WITH THE COSTS BEING BORNE BY THE LOSING PARTY. OUT OF STATE MEDIATION/ARBITRATION/LITIGATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO MEDIATE/ARBITRATE/LITIGATE WITH US IN OHIO THAN IN YOUR OWN STATE. THIS PROVISION MAY NOT BE ENFORCEABLE UNDER YOUR STATE'S LAW.

*Id.* at 2 (emphasis in original). This statement could have more precisely expressed the mutability in the contract's ADR forum clause.[20] However, in other places, the FDD accurately alerts potential franchisees to the precise ADR requirements. *See, e.g.*, *id.* at 4 (chart matching notable franchisee obligations—including ADR requirements—with their corresponding contract provisions); *id.* at 8 (chart listing the various parts of the franchisor-franchisee relationship—including ADR—providing the corresponding contract provisions, and specifically noting that the ADR "[c]hoice of forum" would be "[w]here CKFI's headquarters is located when the action is brought"). Construing the full FDD (to the extent available in the record) as a whole—and considering its clear warnings that the actual contract's terms govern the franchise agreement and that franchisees should read the full contract carefully—there is no obfuscation of the ADR forum requirement. Franchisee reliance only on the above-quoted risk factor to understand the contract's ADR requirements would, under the circumstances, be entirely unreasonable. Further, SAS is a sophisticated business entity and was experienced as a CKFI franchisee prior to receiving the 2016–17 FDD. The FDD thus fails to indicate that any procedural unconscionability tainted SAS's ultimate Agreement assent.

---

[20] Of course, though, despite failing to account for the potential headquarters change contingency, this warning within the FDD did accurately capture the anticipated practical effect of the ADR forum clause at the time the FDD was presented and the Agreement executed.

In sum, nothing in the Agreement itself or in SAS's characterization of its contract review process (including SAS's receipt of the FDD) supports a finding of procedural unconscionability under Kentucky law. Notably, SAS is a relatively savvy corporate (non-consumer) party; while CKFI and SAS are not on perfectly equal footing, the power imbalance is slight compared to consumer cases where Kentucky courts have declined to find procedurally unconscionability. Furthermore, the relevant ADR section titles were bolded/underlined within the Agreement. The specific forum selection component was included twice in plain, clear language. The ADR forum requirement did not unfairly or surprisingly alter the principal transaction. And, SAS had ample opportunity to read, review, and (if it wished) discuss the Agreement's terms with its own counsel, or with CKFI. Consistent with relevant Kentucky cases addressing the issue, these aspects of the Agreement's structure and making defeat SAS's claim of procedural unconscionability.[21]

---

[21] *See Conseco*, 47 S.W.3d at 343 (rejecting consumers' claim that—even if the agreement were adhesive—the arbitration provision was procedurally unconscionable where it "was not concealed or disguised within the form[,]" was "clearly stated such that purchasers of ordinary experience and education [we]re likely to be able to understand it[,]" it did not "alter the principal bargain in an extreme or surprising way[,]" and the consumers admitted "that they had an opportunity to read it"); *accord Schnuerle*, 376 S.W.3d at 576–77 (concluding that arbitration provision in online consumer adhesion agreement was not procedurally unconscionable where it was not concealed/disguised, it used clear, lay language, it did not alter the principal bargain, and the title of the section was bolded); *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 836 (Ky. 2013) (discerning no procedural unconscionability where adhesive arbitration agreement was "stated in clear and concise language[,]" was "not hidden or obscured[,]" and consumer had the chance to read the agreement and watch a video explaining it); *Horton v. Wells Fargo Bank, N.A.*, No. 2014-CA-000110-MR, 2015 WL 1969363, at *2 (Ky. Ct. App. May 1, 2015) (finding that, where consumers understood an adhesion contract's "clearly set forth and comprehensible" terms and were not coerced into signing—despite knowing that "if they had not signed it, they would have been subject to further litigation or would have lost their home"—the "predicament did not rise to the level of [procedural] unconscionability as contemplated by the law"); *cf. Valued Servs. of Kentucky, LLC v. Watkins*, 309 S.W.3d 256, 262 (Ky. Ct. App. 2009) (finding arbitration provision in a consumer payday loan contract procedurally unconscionable because, based on the language used, an ordinary consumer would not have realized that the provision covered intentional torts entirely unrelated to the payday loan transaction).

### b. Substantive Unconscionability

Nor is the ADR forum requirement substantively unconscionable. "Substantive unconscionability 'refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent.'" *Schnuerle*, 376 S.W.3d at 577 (quoting *Conseco*, 47 S.W.3d at 343 n. 22 (citation omitted)). "[C]ourts consider 'the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns.'" *Id.* (quoting *Jenkins*, 400 F.3d at 876). Arbitration agreements (or portions thereof) may be found "unconscionable if their terms strip claimants of a statutory right, which cannot be vindicated by arbitration, because, for example, the arbitration costs on the plaintiff are prohibitively high; or the location of the arbitration is designated as a remote location." *Id.* at 573. However, "simply the impracticality of pursuing a single, small dollar claim is not regarded as an impediment to vindicating one's rights." *Id.*

In particular, Kentucky law directs that a forum-selection clause "be enforced as *prima facia* valid," unless its opponent presents evidence of "countervailing circumstances that would render the clause 'unreasonable.'" *Prezocki v. Bullock Garages, Inc.*, 938 S.W.2d 888, 889 (Ky. 1997); *id.* (quoting *Prudential Resources Corp. v. Plunkett*, 583 S.W.2d 97, 99 (Ky. Ct. App. 1979)) ("If suit in the selected forum would be unfair or unreasonable, the clause will not be enforced."); *accord Midnight Terror Prods., LLC v. Winterland, Inc.*, No. 2011-CA-001300-MR, 2012 WL 5457530, at *3 (Ky. Ct. App. Nov. 9, 2012) ("Forum selection clauses are presumed to be valid and enforceable in Kentucky unless the party opposing enforcement can demonstrate that circumstances render the clause unfair or unreasonable."). In assessing reasonableness, the Court considers: "the inconvenience created by holding the trial in the specified forum; the disparity of bargaining power between the two parties; and whether the state in which the incident occurred

has a minimal interest in the lawsuit." *Prezocki*, 938 S.W.2d at 889 (citing *Prudential*, 583 S.W.2d at 99–100). The "inconvenience" factor encompasses consideration of the parties' "access to proof created by holding the trial in the specified forum." *Midnight Terror*, 2012 WL 5457530, at *3.

A balancing of the *Prudential* factors shows that SAS has not "met its burden of demonstrating that the forum-selection clause should be set aside." *Id.* First, SAS's concern that it will be unable to effectively present desired witness proof to a mediator/arbitrator in California is unfounded, and its generalized claim of witness/proof inaccessibility is unpersuasive.[22] The FAA confers upon arbitrators the ability to compel witness attendance. *See* 9 U.S.C. § 7. Further, the JAMS Arbitration Rules, which the Agreement's ADR provision expressly states will apply, specifically address the issue of distant witnesses. To ensure fair and full case presentation, the Rules afford the arbitrator the freedom, as necessary, to adjust hearing location for witness convenience, permit the arbitrator to issue subpoenas for witness attendance, and allow the parties' to depose and examine witnesses in any location and submit the deposition transcript for the arbitrator's consideration. *See* DE# 59-1 at 6–7. The JAMS rule include discretion on hearing location, relax the rules of evidence, and permit the use of video depositions. *Id.* All of these flexibilities mitigate both the procedural impact and likely cost of a remote ADR. The FAA and applicable JAMS procedures thus contemplate several available measures to adequately protect SAS's ability to completely present its case to an arbitrator or mediator, regardless of the core ADR forum.[23]

---

[22] Notably, SAS does not specify what witnesses it would call, indicate the centrality of the supposed witness proof to its overall case, or provide any concrete evidence (indeed, anything beyond speculation) that those witnesses would have difficulty appearing in California. *See, e.g.*, DE #55-1 at 73 ("I doubt that I will get witnesses to go with me, who's going to go to California with me.").

[23] The protections of the FAA and JAMS Rules squarely refute SAS's blanket assertion that "SAS would be denied any meaningful right to be heard or of due process of law through" ADR in

Nor does the record substantiate SAS's claim of prohibitive cost. The mere fact that participating in the ADR process in California would be more expensive (for SAS) than doing so in Ohio or Kentucky is insufficient to render the forum-selection clause substantively unconscionable. Where "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree Fin. Corp.-Alabama v. Randolph*, 121 S. Ct. 513, 522 (2000). *Green Tree* stopped short of deciding precisely "[h]ow detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence[,]" *id.* at 522–23,[24] but it is apparent here that SAS falls far short of the required showing.

Indeed, SAS "show[s]" no "likelihood" of incurred exorbitant expense at all, but, rather, merely conclusorily presumes that various costs would apply. The sole evidence SAS presents to support its prohibitive cost conclusion is: (1) SAS's discovery responses, which conclusorily assert that "SAS estimates that the cost . . . would be around $20,000.00" plus attorney fees, as "common sense says a plane ticket and hotel will be necessary[,]" and Short will further incur childcare costs and suffer the effects of lost business, *see* DE #55-12 at 1–2, 10;[25] and (2) Short's testimony, which

_____

California because it would require SAS to "call witnesses in another state (which would be impossible to subpoena)." DE #55-12 at 1.

[24] The Supreme Court has not since elaborated on the standard. Nor has the Sixth Circuit done so in the precise ADR forum-selection scenario; however, in analyzing an ADR cost-shifting clause, the Circuit directed courts to take a case- and fact-specific approach, with a focus on whether the clause had a "chilling effect" on individuals' likelihood of initiating ADR proceedings. *See Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 663 (6th Cir. 2003) ("adopt[ing] a case-by-case approach" and holding that individuals must have the chance "to demonstrate that the potential costs of arbitration are great enough to deter them and similarly situated individuals from seeking to vindicate their federal statutory rights in the arbitral forum").

[25] The first response to CKFI's interrogatory inquiring as to cost states in full:

ADR would be cost prohibitive for SAS and require time away from Sarah's business, as well as the fact that Sarah has young children at home. SAS estimates

mirrors the discovery response reasoning and adopts the financial estimate it provides, *see* DE #55-1 at 73–76.[26] There is no itemization, supporting documentation or calculations, or other analysis underlying SAS's bald assertion that ADR in California will cost it $20,000. SAS simply identifies general categories of expenses (without corresponding financial estimates) that are commonly associated with travel (to any location) and offers an unsupported total cost estimate, with no accompanying breakdown or corroborating evidence.[27] SAS's appeal to "common sense" in support of the $20,000 estimate is patently insufficient to carry its "burden of showing the

---

> that the cost for Sarah to attend ADR (requiring possibly two trips to California) in California would be around $20,000 plus the costs incurred for my [sic] attorney.

*Id.* at 12. When asked to then produce "[a]ll documents which reflect the purported additional costs and expenses SAS will incur if SAS is required to mediate and arbitrate . . . in Irvine, California[,]" SAS responded:

> As to California, there are no documents pertaining to California as of yet. But common sense says a plane ticket and hotel will be necessary to mediate or arbitrate in California, as well as the expenses of lawyers for SAS and witnesses, as well as lost business opportunities in Kentucky, and the expense of daycare. Moreover, Sarah's husband will lose work due to having to stay with the kids, and there is an intangible loss to being away from the kids.

[26] Regarding anticipated ADR expenses, Short testified:

> I've got a business to run. I don't have a general manager to take over when I leave, so I have to make all those arrangements. I have two small children that I have to take care of, you know, getting to and fro places, I'm going to have to pay attorney's fees for them to travel to California . . . And so the expense of all that, the expense of flights and cars and hotels and food and someone to operate the business. I'm the one that does admissions to the business, so there's a loss of business opportunity there. They have to stop hiring when I leave because I have a big portion of that . . . It's expensive, it's unreasonable, it's ludicrous.

[27] Another court in this District rejected a similar prohibitive cost argument. *See Ohio Valley Aluminum Co., LLC v. Hydratech Indus. US, Inc.*, No. 3:17-CV-00051-GFVT, 2018 WL 1570792, at *3 (E.D. Ky. Mar. 30, 2018). The *Ohio Valley* court, citing *Schnuerle*, noted that Kentucky courts have "declined to strike down an arbitration provision due to high costs or remote location of arbitration" and noted that "[a]n arbitration agreement that mandates arbitration in the location where a company is headquartered is not" unconscionable. *Id.* The court thus concluded that a Kentucky corporation could not "escape the arbitration clause based on the prospect of excessive costs of traveling to Copenhagen[,]" Denmark. *Id.*

likelihood of incurring such costs." *Green Tree*, 121 S. Ct. at 522. In sum, SAS's assertion that

arbitration will be prohibitively expensive simply "is too speculative to justify the invalidation of

an arbitration agreement" or the ADR forum it designates. *Id.* Accordingly, on this record (which

SAS had opportunity to furnish with proof), SAS's inconvenience argument fails and this factor

weighs against invalidation of the parties' ADR forum-selection clause. [28]

Similarly, as discussed at length *supra* concerning procedural unconscionability, the

parties' relative bargaining power was not so unequal as to warrant clause invalidation. SAS and

CKFI are both sophisticated corporate entities (even if CKFI, perhaps, may be larger and have

greater resources), and the parties dealt at arms' length in executing the Agreement. Further, as

SAS admits it declined to attempt negotiation with CKFI as to any of the Agreement's terms,

including the ADR forum choice—despite SAS's awareness of a potential dispute percolating—

the record is silent as to whether such negotiation would have been successful.[29] Here, at the

---

[28] In arguing that California is an unreasonably inconvenient forum, SAS relies heavily upon *Wilder v. Absorption Corp.*, 107 S.W.3d 181 (Ky. 2003). In *Wilder*, the Kentucky Supreme Court (after the Court of Appeals's prior remand for consideration of the *Prudential* factors) upheld the trial court's factual determination that a clause requiring arbitration and/or litigation in Washington state "would produce a manifest injustice and would result in an inconvenience of forum so serious as to deprive [the clause's opponents] of their opportunity for a day in court." *Id.* at 185. In deferring to the trial court's factual findings, the Kentucky Supreme Court reasoned that, as "[t]he evidentiary hearing . . . involved live testimony from witnesses" and involved competent counsel for both sides, "[t]he Court of Appeals was incorrect in disturbing the findings of fact as presented to the circuit judge and endorsed by him." *Id.* The *Wilder* opinion does not suggest what facts the trial court relied upon in evaluating the *Prudential* factors; it merely confirms that the test is highly fact-specific and, thus, the trial court is in the best position to review the facts presented and apply the relevant factors. Here, the Court's determination that SAS's factual showing fails to demonstrate any "manifest injustice" or inconvenience "so serious as to deprive" SAS of its "opportunity for a day in court[,]" *id.*, is in harmony with *Wilder*'s endorsement of a fact-driven approach to the *Prudential* calculus.

[29] Although Short cites her "experience of '07 where you don't negotiate it" to substantiate SAS's claim that any 2017 negotiation would have been fruitless, the Court is unwilling to speculate—based on Short's vague recall of the 2007 process—that CKFI would have spurned attempts to negotiate the specific ADR forum provision in 2017. DE #55-1 at 59; *see id.* at 28 ("'So it's fair to

summary judgment stage, SAS has had full opportunity to supply any evidence available to it. Yet, the record is devoid of facts from which the Court could possibly conclude that the parties' disparate bargaining leverage (if any) renders the ADR forum clause unreasonable or unfair. *Cf. Prezocki*, 938 S.W.2d at 889 (remanding because, given the trial court's prior decision on a motion to dismiss, the "Court ha[d] an inadequate set of facts upon which to base an appropriate legal determination"); *accord Midnight Terror*, 2012 WL 5457530, at *3 (remanding for an "evidentiary hearing [to] evaluate the proof in light of the relevant *Prudential* factors," as only then could the lower court "properly evaluate Winterland's motion to dismiss"). This *Prudential* factor too counsels against discarding the parties' contractual forum choice.

Lastly, the Court considers Kentucky's interest in the substance of the parties' dispute. *Prezocki*, 938 S.W.2d at 889 (citing *Prudential*, 583 S.W.2d at 99–100). The subject matter of the underlying franchise territory controversy occurs entirely in Kentucky, involving claimed encroachment by a Lexington CKFI franchisee into SAS's Somerset territory. Kentucky then, has interest in the issue. Nevertheless, Kentucky's potential interest in the geographical aspect of what is, at bottom, a contract dispute (that implicates no larger policy concerns) between a national franchisor and a franchisee that simply happens to be located in Kentucky, does not outweigh the other *Prudential* factors here. On balance, SAS has not shown that the Agreement's ADR forum requirement is unreasonable or unfair, per the relevant considerations and under the applicable standards. Regardless of whether ADR in California is more convenient for CKFI than SAS, the forum-selection clause is not "unreasonably or grossly favorable to" CKFI, and it is not substantively unconscionable. *Schnuerle*, 376 S.W.3d at 577.

---

say you believe that you had some questions or issues that you raised with CKFI [in 2007], but you don't have any recollection of what those questions or issues were?' 'Correct.'").

The Court notes that SAS devotes no discussion to the incremental difference between ADR in Ohio and ADR in California. SAS makes no unconscionability argument to the basic premise of ADR in Ohio per the franchise agreement(s). The key, then, is whether forum selection mutability—based on potential variability in principal place of business—is itself unconscionable. ADR anywhere, like litigation anywhere, would cost money. ADR in California would, as to this dispute, logically cost more than the more proximal Ohio situs. However, the marginal difference is not in any way defined and certainly not demonstrably prohibitive.

The dimensions of the potential underlying dispute and the commercial nature of the relationships affect the Court's analysis. SAS, with market entry choices, entered a deal with CKFI. That relationship stood for a decade. As renewal approached, nothing suggests that SAS explored other partners. Instead, SAS, with plenteous notice, elected to renew on the terms in effect at the time of renewal. It well knew or certainly had the full chance to know each and every proposed term, including the historically consistent ADR language. Part of the calculus of a deal, especially a renewal with brewing conflict in the hopper, would include study of what happens at conflict resolution. SAS, experienced and sophisticated, should have factored CKFI's potential relocation[30] into the business risk assessment. The clause itself—clear, thoroughly known, of long duration—is not one that benefits CKFI in a procedurally or substantively unfair way. SAS's behavior, being well-armed with information and expertise and yet choosing to enter the franchise agreement, shows that a rational entity would, in fact, agree to the terms. That is just what happened. The term at issue benefits CKFI, but not in a grossly unfair manner. SAS in fact agreed.

---

[30] The forum mutability provision really is a means of keeping the original principal—ADR at CKFI's main location—evergreen. Businesses do move, and the clause simply assured instant currency to the parties' long-term agreement.

The ADR process, even in California, permits full resolution of the dispute with provision for access to all proof. The Court enforces the agreement as written.

### E. Conclusion

The forum-selection component within the Agreement's ADR provision is not unconscionable (procedurally or substantively), and SAS has pursued no other contractual defense. The FAA thus directs enforcement of the forum-selection clause as written, and the Court finds valid the requirement that the ADR process take place in CKFI's then-current principal place of business. Accordingly, the Court **GRANTS** the Plaintiff's Motion for Summary Judgment (DE #51) and **DENIES** Defendant's opposing Motion (DE #52), and **AWARDS** CKFI declaratory judgment as sought.[31] A separate Judgment follows.

This the 10th day of July, 2019.

Signed By:

_Robert E. Wier_

**United States District Judge**

---

[31] CKFI's perfunctory attorney's fee request here fails. The "Attorney Fees and Costs" provision in the operative Agreement provides that SAS must, where applicable, "pay to CKFI all damages, costs and expenses (including reasonable attorneys' fees) that CKFI incurs *subsequent to the termination or expiration of the franchise granted under this Agreement*[.]" DE #9-3 at 5 (§ 12.12 of the Agreement) (emphasis added). The Agreement is extant. The paragraph does not apply to an intra-contract dispute.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| CK FRANCHISING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 6:18-CV-94-REW-HAI |
| v. | ) | |
| | ) | |
| SAS SERVICES, INC., | ) | JUDGMENT |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

In accordance with its accompanying Opinion and Order, the Court **ORDERS** and **ADJUDGES** as follows:

(1) The Court **GRANTS** the sought declaratory judgment in favor of Plaintiff and against Defendant on the Amended Complaint's sole claim. The ADR provision of the parties' agreement, to include the forum selection clause, is enforceable per its terms; and

(2) The Court **STRIKES** this matter from its active docket.

This is a final and appealable Judgment.

This the 10th day of July, 2019.

Signed By:

*Robert E. Wier*

**United States District Judge**